**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 07 2014, 9:55 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**REBECCA A. TRENT**
Brookston, Indiana

ATTORNEY FOR APPELLEE:

**LUCILLE P. UTTERMOHLEN**
Monticello, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In Re the Guardianship of | ) | |
| Ruth Carter, an Incompetent Adult, | ) | |
| | ) | |
| COLLEEN F. BATT, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 91A02-1306-GU-538 |
| | ) | |
| MARSHA K. MOORE, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE WHITE CIRCUIT COURT
The Honorable Robert W. Thacker, Judge
Cause No. 91C01-1210-GU-23

**February 7, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Colleen F. Batt ("Batt") appeals the trial court's order establishing guardianship for the person and estate of her mother Ruth Carter ("Carter"), as an incapacitated adult. On appeal, Batt raises the following restated issues:

I. Whether the trial court abused its discretion in determining that Carter was an incapacitated adult for whom guardianship over the person and estate was necessary; and

II. Whether the trial court abused its discretion in naming a third party, Rebecca A. Trent ("Trent"), and not Batt, as Carter's guardian.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Carter, with her husband Charles Carter ("Charles"), had two children, Marsha K. Moore ("Moore") and Batt. The relationship between Moore and her parents was contentious and, in 2003, Moore and her parents became estranged. During the guardianship hearing, Batt and Moore each admitted that their relationship with each other was also difficult. *Tr*. at 12 (Batt noted that she and Moore have had a "hostile relationship" "for a long time"); *Id*. at 57 (Moore admitted that she "wants to have no relationship with [her] sister").

On December 24, 2003, Carter executed a power of attorney, which designated Charles as her attorney-in-fact and named Batt as the alternate attorney-in-fact in the event that Charles was unable to serve in that position. *Appellant's App*. at 19. Charles died in June 2009, when Carter was almost eighty years old. Also in 2009, Moore and her mother began to speak with each other on a limited basis.

2

Charles's death resulted in Batt becoming Carter's attorney-in-fact in 2009; however, Batt did not regularly function as such until after her mother suffered a stroke in March 2011. *Tr.* at 12. Carter had to move into a nursing home after her stroke, and Batt oversaw her mother's financial and medical affairs as Carter's attorney-in-fact. Pursuant to that power, Batt distributed Carter's personal property to the families of Batt and Moore, and then scheduled a public auction to be held on October 6, 2012, in order to sell the remaining personal property.

Prior to the auction, Moore filed a petition on October 1, 2012, to establish a guardianship over Carter. She also filed a motion for restraining order without notice to keep Batt from "removing, . . . selling, damaging, encumbering, transferring, concealing, destroying or otherwise disposing of any property, real or personal belonging to [Carter]." *Appellant's App.* at 13. That same day, the trial court granted Moore's request and entered an order restraining both Moore and Batt from, in any way, disposing of Carter's property until after the guardianship hearing. Four days later, Batt filed a petition to vacate the restraining order, arguing that she had entered into a contract, as Carter's attorney-in-fact, to auction items of Carter's personal property and that a delay of the auction would cause Carter to incur additional costs. *Id.* at 16-17. The trial court granted Batt's petition, which allowed the auction to proceed as planned. However, in order to safeguard Carter's assets, the trial court also ordered the auction service to "deposit the proceeds of said auction along with a[n] itemized report of said sale with the Clerk of White County," pending a hearing on the petition for guardianship. *Appellant's App.* at 25.

The guardianship hearing commenced on February 26, 2013, but was adjourned until April 24, 2013 to allow Moore to obtain appropriate documentation regarding Carter's capacity, *tr.* at 89-90, specifically the physician's report required under "Local Rule 91-TR81-PROB-30(13)(a)." *Appellant's Br.* at 4. Moore submitted a package of medical records for the trial court's consideration, but did not file the requisite physician's report. Batt arranged for Carter to be examined by Dr. Kelly S. Earnst ("Dr. Earnst"), a clinical neuropsychologist. The examination occurred over a two-day period, March 8 and 12, 2013, and Dr. Earnst's report was made a part of the record, but sealed from public view. Following the continuation of the guardianship hearing on April 24, 2013, both parties submitted proposed findings of fact and conclusions thereon. On May 30, 2013, the trial court entered its guardianship order, which determined that Carter was an incapacitated adult and the appointment of a guardian was necessary.[1] In pertinent part, the trial court's order provided as follows:

10. Dr. Earnst's report finds that Carter suffers from moderate to severe dementia and shows generally global cognitive impairment, thus requiring assistance with most all of her daily activities and cannot make independent complex decisions.

11. Despite Carter's cognitive limitations, Dr. Earnest was able to discuss with Carter the current situation of Batt providing decision making through the Power of Attorney, and Carter indicated that she was satisfied with Batt.

12. Dr. Earnst believed that Carter's needs were being met by the efforts of Batt and the nursing home.

---

[1] We commend the trial court on its Guardianship Order; the trial court's thorough findings and conclusions greatly aided appellate review.

4

13.     At the time of this hearing, Carter does not have the physical nor cognitive ability to manage all of her personal needs, medical needs, and the complex needs of her estate.

14.     Batt has been taking care of Carter's financial and medical affairs utilizing the Power of Attorney, and could continue to use the Durable Power of Attorney to manage Carter's needs.

15.     In this case, the purpose of the guardianship proceeding is to determine if the alleged incapacitated adult person is legally incapacitated requiring a guardianship as a reasonable and necessary legal entity to manage such person's personal, legal, and medical needs.  Further, if guardianship is required, then who should serve as guardian and should such guardian be of the person, the estate, or both.

16.     Based upon the evidence presented, the Court **FINDS** and **ORDERS** that Ruth Carter is an adult incapacitated person who suffers from mental and physical disability due to stroke and dementia, and that a guardianship is reasonable and necessary and in her best interest.  The Court finds that a guardianship is the best means to manage Ruth Carter's personal and legal affairs and medical needs.  The Court finds that a guardianship is preferred over a Durable Power of Attorney under the facts and circumstances presented in this case.  The sisters Moore and Batt do not communicate or cooperate well enough with each other to either individual or jointly adequately manage their mother's affairs.  The POA Batt has been dutifully managing her mother's affairs; however, as Power of Attorney she is at odds with her sister as the POA and personally.  The evidence presented regarding the nature of the disagreements between the sisters, the nature of the incapacity of the mother, and the extent of the mother's assets and liabilities, as a total set of circumstances convinces the Court that a guardianship is reasonable and necessary and a preferred alternative to simply a durable power of attorney.  Additionally, the difficult family and emotional circumstances also weigh heavily on the well-being of the mother which indicates to the Court that a guardianship is more suitable to meet the needs of the incapacitated mother specifically and the family generally.  Therefore, it is in the best interest of the incapacitated person personally, financially, and medically, and for the family as a whole that a guardianship of the person and estate be ordered and a guardian appointed.

. . . .

18.     The Court **FINDS** and **ORDERS** that the most qualified and suitable person to serve as guardian of the person and estate herein is

5

Rebecca A. Trent, who is well acquainted with Ruth Carter and her legal affairs and medical needs, as well as well acquainted with her family members.[2] The Court finds that the sisters both indicated in their testimony in Court that they would accept Rebecca A. Trent as a qualified and suitable person to serve as guardian of the person and estate of their mother, Ruth Carter. . . . Further, the Court FINDS and ORDERS that the guardian shall formally vacate the Durable Power of Attorney upon the guardian's qualification and issuance of Letters of Guardianship.

. . . .

*Appellant's App.* at 8-10. Batt now appeals both the determination that a guardianship is warranted and the appointed of a third person as guardian.[3] Additional facts will be added where necessary.

## DISCUSSION AND DECISION

### I.     Determination of Need for Guardianship

The trial court is vested with discretion in making determinations as to the guardianship of an incapacitated person. *In re Guardianship of Atkins,* 868 N.E.2d 878, 883 (Ind. Ct. App. 2007) (citing Ind. Code § 29-3-2-4), *trans. denied.* Thus, we review the trial court's determination only for an abuse of that discretion. *In re Guardianship of J.K.*, 862 N.E.2d 686, 690 (Ind. Ct. App. 2007). In determining whether the trial court abused its discretion, we look to the trial court's findings of fact and conclusions thereon, and we may not set aside the findings or judgment unless they are clearly erroneous. *Id.*

---

[2] Trent had been Carter's attorney for more than nine years, and served as Batt's attorney during the guardianship proceedings and in the instant appeal.

[3] Prior to filing her appeal, Batt filed a "Motion to Stay" with the trial court. *Appellant's App.* at 5. A CCS entry notes: "Court enters order Staying Final Judgment Dated May 30, 2013. The Court Orders that appointment of Rebecca A. Trent as guardian and the vacation of the December 24, 2003 Power of Attorney is stayed until the determination by the Court of Appeals. It is further ordered that Colleen F. Batt is directed to provide monthly accountings to Marsha K. Moore until further Order of this Court. Filed and Ordered 6/21/2013." *Id.*

In our review, we first consider whether the evidence supports the factual findings, and second, we consider whether the findings support the judgment. *Id.* "'Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference.'" *Id.* at 690-91 (quoting *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind. 1996)). "We give due regard to the trial court's ability to assess the credibility of witnesses." *Id.* at 691. "While we defer substantially to findings of fact, we do not do so to conclusions of law." *Id.* "We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment." *Id.* (citing *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999)).

A guardianship action is initiated by filing "a petition for the appointment of a person to serve as guardian for an incapacitated person," Ind. Code § 29-3-5-1; however, a guardian may not be appointed until the incapacity has been adjudicated. Ind. Code § 29-3-5-2. Indiana Code section 29-3-5-3(a) provides that a trial court "shall appoint a guardian" if the court finds that: (1) "the individual for whom the guardian is sought is an incapacitated person"; and (2) "the appointment of a guardian is *necessary* as a means of providing care and supervision of the physical person or property of the incapacitated person." Ind. Code § 29-3-5-3(a) (emphasis added).

On appeal, Batt focuses on the second part of this two-part inquiry, whether appointment of a guardian for Carter is *necessary*; however, we must first address the incapacity component. The following findings were part of the order granting the guardianship petition:

7

10.     Dr. Earnst's report finds that Carter suffers from moderate to severe dementia and shows generally global cognitive impairment, thus requiring assistance with most all of her daily activities and cannot make independent complex decisions.

. . . .

13.     At the time of this hearing, Carter does not have the physical nor cognitive ability to manage all of her personal needs, medical needs, and the complex needs of her estate.

*Appellant's App*. at 8. From this, the trial court concluded that "Ruth Carter is an adult incapacitated person who suffers from mental and physical disability due to stroke and dementia." *Id*. The trial court did not abuse its discretion in finding that Carter was incapacitated.

Regarding the second part, Batt contends that the trial court abused its discretion in determining that a guardian for Carter was *necessary* because Batt, as Carter's attorney-in-fact, could provide Carter with the appropriate medical and legal care. Batt correctly notes that her power of attorney was not terminated by the incapacity of Carter. *Appellant's Br*. at 9 (citing Ind. Code § 30-5-10-3). Quoting from our opinion in *In re Guardianship of Shaffer*, 711 N.E.2d 37, 41 (Ind. Ct. App. 1999), *trans. denied*, Batt also suggests that the trial court cannot impose a guardianship over the person or estate of Carter because they are already subject to a valid power of attorney. We disagree.

In *Shaffer* we cited to Indiana Code section 30-5-3-4(b) and stated, "'once a power of attorney is created, no guardianship can be imposed with regard to matters that are subject to the power.'"[4] *Shaffer*, 711 N.E.2d at 41. However, in light of the facts before

---

[4] In *Shaffer,* the issue before the court was whether it was an abuse of discretion for the trial court to award attorney fees to the attorneys in fact for defending the validity of their powers of attorney in a guardianship proceeding. *In re Guardianship of Shaffer*, 711 N.E.2d 37, 41 (Ind. Ct. App. 1999).

this court, we find that the *Shaffer* language is an incomplete statement of the law.

Indiana Code section 30-5-3-4(b) provides:

> (b) A guardian does not have power, duty, or liability with respect to property or personal health care decisions that are subject to a valid power of attorney. A guardian has no power to revoke or amend a valid power of attorney unless specifically directed to revoke or amend the power of attorney by a court order on behalf of the principal. A court may not enter an order to revoke or amend a power of attorney without a hearing. Notice of a hearing held under this section shall be given to the attorney-in-fact.

We agree with Batt's assertion that the above language restricts a court's power to establish a guardianship over the person or estate of a person already subject to a valid power of attorney and clarifies the limitations of a guardian's power when a guardianship and power of attorney co-exist for one person or that person's estate. However, the statute clearly contemplates that a guardianship may be established in place of a valid power of attorney if certain conditions are met. *See* Ind. Code § 30-5-3-4(b) ("A guardian has no power to revoke or amend a valid power of attorney *unless specifically directed to* revoke or amend the power of attorney by a court order on behalf of the principal.") (emphasis added).

Batt also contends that the trial court abused its discretion in failing to follow Dr. Earnst's report, which in pertinent part provided:

> [Carter] is not capable of independent complex decision-making. At the same time, during the interview, Ms. Carter expressed awareness of her need for assistance with decision making, and her satisfaction with the current situation of receiving this assistance through her daughter/POA, [Batt], and nursing home staff.

9

*Appellant's Br.* at 9 (citing *Appellant's App.* at 66). Batt maintains that the trial court

harbored concerns that Dr. Earnst's report was biased in Batt's favor[5] and, as a

consequence, the trial court did not consider Dr. Earnst's statement that Carter was

satisfied with Batt's assistance as power of attorney. We disagree. During the

guardianship hearing, the trial court noted:

> I don't know whether I got a fair assessment of the patient's capacity regarding the necessity of guardianship. I certainly got an assessment of [Dr. Earnst's] view of whether or not this patient could continue to function reasonably appropriately or successfully with one of the patient's daughters as the POA, and [Dr. Earnst] clearly is kind of approving of that and *he's not giving me an opinion about the patient being able to function in and of the patient's own right*.

*Tr.* at 125-26. The trial court did not discount this statement as biased; instead, the court

found that the statement was not relevant to the issue of whether Carter was

incapacitated—the only issue that Dr. Earnst was qualified to address.

The parties were provided an alternative to guardianship. The trial court

adjourned the February 2013 hearing to allow the parties to obtain the necessary medical

report. At the close of the hearing, the trial court stated:

> 10:00 a.m. Wednesday, April 24[, 2013] we'll have further hearing and I mean, that's fifty some days, you ought to be able to get the medical report exchanged and have some time to talk, is [sic] you all can do that. I'm, of course, suggesting and recommending that you do that, but, again, I can't make you, I can only suggest that the sisters try to figure out some sort of truce and figure out a way to get accomplished what each of you want to try to accomplish without having to come to Court. I mean you can come to Court with an agreed guardianship; you can come to Court and tell the Court you don't think you need one yet; I don't know what the doctor's going to recommend to you all either. . . .

---

[5] The trial court, speaking with Batt, noted: "[Y]ou're the one that chose him, so theoretically objectively he's working for his patient, but on the other hand, he's working for you, and you're the point of controversy with the other party . . . ." *Tr.* at 125.

10

*Id*. at 89-90. When the hearing reconvened in April, the parties had not reached any kind of an agreement.

While the trial court recognized that Batt could continue to act as Carter's attorney-in-fact, it made a specific finding that "a guardianship is preferred over a Durable Power of Attorney under the facts and circumstances presented in this case." *Appellant's App*. at 9. Noting that (1) "[t]he sisters Moore and Batt do not communicate or cooperate well enough with each other to either individually or jointly adequately manage their mother's affairs," (2) "the nature of the disagreements between the sisters, the nature of the incapacity of the mother and the extent of the mother's assets and liabilities, as a total set of circumstances convinces the Court that a guardianship is reasonable and necessary and a preferred alternative to simply a durable power of attorney"; and (3) "the difficult family and emotional circumstances also weigh heavily on the well-being of the mother," the trial court concluded that it was in "the best interest" of Carter "personally, financially, and medically" . . . that the guardianship of the person and estate be ordered and a guardian appointed. *Id*. The trial court did not abuse its discretion in concluding that the appointment of a guardian was necessary to provide for the care and supervision of Carter's physical person and property.

## II.    Named Guardian

Batt maintains that Indiana law gives a person holding a power of attorney preference over others to be named guardian. Accordingly, Batt argues that the trial court abused its discretion in naming attorney Trent, instead of her as guardian. The interplay

between a guardianship and power of attorney must be divined from provisions in Title 29, which pertains to Probate, and Title 30, which pertains to Trusts and Fiduciaries.

Article 29-3 of the Indiana Code specifically addresses "Guardianships and Protective Proceedings." Indiana Code section 29-3-5-4, in pertinent part, provides, that a trial court shall appoint as guardian a qualified person or persons most suitable and willing to serve, having due regard to the following: "Any request made by a person alleged to be an incapacitated person, including designations in a durable power of attorney . . . and [a]ny person acting for the incapacitated person under a durable power of attorney." Indiana Code section 29-3-5-5(a) sets forth persons who are "entitled to consideration for appointment as guardian," with the first being "[a] person designated in a durable power of attorney." Indiana Code section 30-5-3-4(a) requires the trial court to "make an appointment in accordance with the principal's most recent nomination in a power of attorney except for good cause or disqualification." Noting that she was not disqualified, Batt argues that the trial court stated no "good cause" for failing to name her as guardian.

Although the trial court did not explicitly state that there was "good cause" for not appointing Batt, we can discern the reasons from the testimony and the trial court's order. During the guardianship hearing, Batt and Moore each admitted that their relationship with each other was difficult. Batt noted that she and Moore have had a "hostile relationship" "for a long time," *tr*. at 12; while Moore admitted that she "wants to have no relationship with [her] sister." *Id*. at 57. When asked what information she would share with Moore, Batt stated that if she were guardian, she would share the information

12

required by law. *Tr*. at 13. Batt, explained, however, that Moore's questions to her are barbed, have a word of skepticism and an "emotional jab," and that she is not willing to endure that kind of conversation or communication. *Id*. at 14. Moore said that she was unable to obtain information about her mother's health or financial affairs, and she did not think that Batt was carrying out her mother's wishes. *Tr*. at 38. She also stated that she thought Batt was doing things with her mother's money for her own benefit and not that of her mother. *Id*. The trial court correctly found that animus exists between Batt and Moore and concluded that the sisters do not communicate or cooperate well enough to either jointly or individually manage their mother's affairs. *Appellant's App*. at 9. This finding reflects the trial court's belief that there was good cause not to appoint Batt as guardian.

Indiana Code section 29-3-5-5(b) provides the trial court with discretion to choose as a guardian a person other than the power of attorney. That section provides, "The court, acting in the best interest of the incapacitated person . . . *may pass over a person having priority and appoint a person having* a lower priority or *no priority* under this section." Ind. Code § 29-3-5-5(b) (emphasis added). As to the choice of Trent, when asked about who should be named guardian, Batt testified that if she could not be guardian, she thought the guardian should be Trent, reasoning that Trent had been her mother's attorney since prior to 2003.[6] *Tr*. at 144. Batt agreed that "the guardian, whoever it is, ought to account to [Batt] and [Moore] about what's going on. *Id*. at 145.

---

[6] Regarding Trent as guardian, Moore testified, "I'd like a neutral party, and I'm not sure that Ms. Trent can be since she's my sister's lawyer. Uhm, other than that, I just want a neutral party." *Tr*. at 148. While Moore was not in favor of the appointment of Trent as guardian, Moore does not appeal that appointment.

The trial court found that Trent was "well acquainted with Ruth Carter and her legal affairs and medical needs, as well as well acquainted with her family members." *Appellant's App*. at 9. It is in Carter's best interest both as to her health and her financial affairs that her two daughters avoid engaging in a protracted legal fight. The appointment of Trent, an arguably disinterested party, as the guardian over Carter's person and estate hopefully will prevent unnecessary disputes caused by mistrust between Batt and Moore. Therefore, we conclude that Batt has failed to demonstrate that the trial court abused its discretion when it appointed Trent as guardian over Carter's person and estate.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.